UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-60256-CIV-BLOOM/Valle

ROBERT LOUIS VANDERWALL
and WILLIAM LYNN VANDERWALL,

      Plaintiffs,

v.

UNITED AIRLINES, INC.,

      Defendant.
_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon the Motion for Summary Judgment, ECF No. [32] (the "Motion"), filed by Defendant United Airlines, Inc. ("United" or "Defendant"). The Court has reviewed the Motion, all supporting and opposing filings and submissions, and the record in the case. For the reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED**.

### I.    PROCEDURAL BACKGROUND

Plaintiffs William Lynn Vanderwall ("Plaintiff") and Robert Louis Vanderwall seek damages for injuries suffered by Plaintiff when she slipped in the aisle of a United aircraft en route from Houston, Texas to London, England. Plaintiffs' Complaint asserts three causes of action: Defendant's liability under the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, reprinted in S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 309, 1999 WL 33292734 (2000) (the "Montreal Convention") (Count I); common law negligence (Count II); and a derivative claim for loss of consortium by Robert Louis Vanderwall (Count III). ECF No. [1]. Defendant timely answered the Complaint. *See* ECF No. [4].

Defendant filed the instant Motion on August 6, 2014. By Order on August 22, 2014, ECF No. [44], and September 23, 2014, ECF No. [54], the Court imposed a December 29, 2014 deadline for Plaintiffs' response to Defendant's Motion. In the intervening period, the parties have engaged in discovery. Plaintiffs responded on December 29, 2014, ECF No. [79] (the "Response"); and Defendant replied on August 25, 2014, ECF No. [89] (the "Reply"). *See* ECF No. [85]. The parties have submitted statements of facts and attendant evidence in support of and opposition to the Motion. *See* ECF Nos. [32], [67], [70], [76], [77], [78], [81], [82]; *see also* ECF No. [85].

## II.   MATERIAL FACTS

On March 30, 2012, Plaintiff was an economy/coach passenger on United flight number 34 ("United 34"), which was operated by Continental Airlines, Inc. ("Continental"), from George Bush Intercontinental Airport / Houston ("IAH") to London Heathrow Airport ("LHR"). *See* ECF No. [32-1] (Beuker Affidavit) ¶ 9; ECF No. [32-2] (Itinerary). Her flight originated in Fort Lauderdale, Florida on March 30, 2012. *See* Beuker Aff. ¶ 4. Plaintiff's ticketed itinerary was for international carriage by air. *See* Itinerary. Her place of departure on March 30, 2012 was the United States of America and her place of destination on March 31, 2012 was the United Kingdom. *Id*. United 34's scheduled departure from IAH was 3:45 p.m. on March 30, 2012. *Id*. The actual departure time was 4:08 p.m. Beuker Aff. ¶ 5. The flight's scheduled arrival time at LHR was 6:55 a.m. Id. ¶ 9. Its actual arrival time was 7:38 a.m. local time. *Id*. The total travel time from IAH to LHR was five-hundred and seventy (570) minutes or nine and a half (9.5) hours. *Id*.

The incident that is the subject of the instant action took place on United 34 en route from IAH to LHG approximately one to one and a half hours before landing. *See* ECF No. [32-5]

2

(Plaintiff Dep. Tr. Vol. 2) 251:10-12; ECF No. [82-1] (Plaintiff Dep. Tr. Vol. 1) 137:11-19. During the course of the nine and a half hour flight, there came a point when the cabin lights were dimmed to allow passengers to sleep. Mtn. at 3 ¶ 7; ECF No. [81] (Plaintiffs' Counter-Statement and Statement of Facts) ¶ 7. There remained some ambient lighting. Mtn. at 3 ¶ 7; Pls. Stat. Facts ¶ 7, 10.a; Plaintiff Dep. Tr. Vol. 2 252:5-10. It was standard practice at Continental and the airline industry in March 2012 for cabin lighting to be dimmed to the night setting for flights with schedules comparable to United 34. Mtn. at 16-17 ¶¶ 15-16; Pls. Stat. Facts ¶¶ 15-16. The night lighting on United 34 had been Plaintiff's experience on previous transatlantic flights and she was not surprised by the darkened and quiet cabin. Mtn. at 3 ¶ 7; Pls. Stat. Facts ¶ 7. *See also* Plaintiff Dep. Tr. Vol. 2 245:3-246:7.

Plaintiff left her seat to use the lavatory toward the rear of the airplane. Mtn. at 4 ¶ 9; Pls. Stat. Facts ¶ 9; ECF No. [32-6] (Plaintiff's Supplemental Responses to Interrogatories) No. 6. The lavatory was a short distance, no more than two rows or a couple of yards, directly behind Plaintiff's seat. Plaintiff Dep. Tr. Vol. 2 254:14-255:6. Plaintiff made her way to the lavatory without incident. Mtn. at 4-5 ¶ 10; Pls. Stat. Facts ¶ 10. She did not notice anything on the floor on her way to the lavatory. Plaintiff Dep. Tr. Vol. 2 257:5-258:22. She spent only approximately five to ten minutes in the lavatory. Pl. Dep. Tr. Vol. 2 259:17-21. When Plaintiff exited the lavatory, the lavatory light illuminated the aisle floor around it. Mtn. at 4-5 ¶ 10; Pls. Stat. Facts ¶ 10. To return to her seat, Plaintiff took three or four steps in the aisle toward the front of the aircraft. Plaintiff Dep. Tr. Vol. 2 266:11-13. Plaintiff stepped on something with her right foot, fell to the side and experienced a twisting and popping in her right knee. Mtn. at 4-5 ¶ 10; Pls. Stat. Facts ¶ 10. She later learned that she had torn her anterior cruciate ligament. Pls. Supp. Resp. No. 6.

Plaintiff describes the "trash" she stepped on as a piece of translucent plastic, no specific color but "more clear" such that "you could see through it," but not as clear as glass. Plaintiff Dep. Tr. Vol. 1 94:7-104:6. It was a "fragmented," "ripped" or torn "piece of plastic" (not a square, rectangle, round or oval), "thinner than a business card" and maybe only as thick as a piece of copy paper or a magazine page, more like "Saran wrap" (but not "wax paper"). *Id*. In terms of its size, the scrap of plastic had dimensions smaller than six inches by three inches, appearing to be the size of a wadded up paper towel. *Id*.

The parties dispute whether and to what extent Plaintiff is a "frequent flyer." See Mtn. at 5-6 ¶ 12; Pls. Stat. Facts ¶ 12. Regardless of her status, Plaintiff states that, as a child, she traveled overseas very frequently, and that, currently, she flies domestically twelve times per year and has flown from the United States to Europe on several occasions. Pls. Stat. Facts ¶ 12.b.

As was standard practice at Continental, a third party vendor at IAH under contract with Continental cleaned the cabin of United 34 on March 30, 2012 prior to any passenger boarding and departure from IAH. Mtn. at 6 ¶ 13; Pls. Stat. Facts ¶ 13. The vendor's cleaning at IAH for international "turn" flights (flights that are unloaded after arrival at the gate and then prepared for departure again), like United 34, consisted of a variety of tasks and it was mandatory to "remove trash, crumbs, debris from floor" and to "[v]acuum." *Id*. It was standard practice at Continental and in the airline industry in March 2012 that cabin floors for international "turn" flights were clean and free of trash, crumbs and debris prior to the boarding of passengers. *Id*. ¶ 14.

George Bush Intercontinental Airport, like most U.S. airports, has a variety of specialty shops, restaurants, convenience stores, food courts and duty-free stores inside the post-security

concourses.  Mtn. at 8 ¶ 21; Pls. Stat. Facts ¶ 21.  Passengers may purchase a vast array of items and then use or consume them in-flights.  *Id*.  Many of the items commonly are wrapped in plastic shrink-wrap or are otherwise packaged in some form of plastic or paper.  *Id*.  In flight, Continental (now United), in March 2012 and today, made available to its customers pillows and blankets that are individually packaged in shrink-wrap plastic.  *Id*.  In addition, amenity kits that are individually shrink-wrapped and that have contents also packaged in plastic are provided to select customers.  *Id*.  Complimentary food service items often are covered or packaged with plastic.  *Id*.  Many customers in March 2012 and today pack and carry on board personal items such as crayons for children, snacks and cosmetics that are wrapped in plastic for use on the flight.  *Id*.

The parties' submissions highlight a seemingly disputed factual issue:  to what extent, in terms of volume, timing and from whose perspective, it was unexpected or unusual on Continental or United flights and in the airline industry in March 2012 for there to be trash or debris, including paper or plastic items, on the cabin floor and aisles during a transatlantic flight.  Defendant has submitted declarations from career flight attendants and from United's director of inflight safety services and relies on the depositions on several other career flight attendants to the effect that it is common throughout a flight – including on the specific Houston to London route flown by United 34 – for paper or plastic (as well as other) trash to be dropped on the aircraft floor by passengers, that such trash routinely migrates to (or is placed in) the aisles, and that flight attendants are not required to and do not routinely or always remove that trash within a specified or an immediate timeframe.  *See* ECF Nos. Beuker Decl. ¶¶ 13-14, 16, [67] (Washington Decl.) ¶¶ 10-12, [70] (Sheffield Decl.) ¶¶ 9-12, [76] (Second Sheffield Decl.)¶ 6 (pertaining to trash on floor after passenger disembarkation), [77] (Second Washington Decl.)

5

¶ 6 (same), [78] (Third Washington Decl.) ¶ 6 (same); *see also* ECF No. [82-7] (Sheffield Affidavit) 49:13-15:2; ECF No. [82-10] (Pettingill Dep. Tr.) 16:10-27:23; ECF No. [82-5] (Judy Dep. Tr.) 19:10-20:11, 21:8-32:20; ECF No. [82-9] (McGee-Ebert Dep. Tr. 65:2-69:25). Plaintiffs rely on their own career flight attendant and an expert witness to state that flight attendants are required and expected to remove trash and debris that constitute passenger safety hazards from the aisles and that trash would not frequently be found in an aircraft's aisles midflight. Cordes Decl. ¶¶ 7-15; Mackey Decl. ¶¶ 9-10, 12. However, they recognize that neither Continental nor United had any specific policies or procedures directed to picking up trash in an aisle of an aircraft midflight. Pls. Cntr.-Stat. Facts ¶ 16. Further, Plaintiff testified that she does not consider flight attendants to be janitors, and she appears to be of two minds as to whether a certain amount of trash in the aisles is expected or unexpected. *See* Pls. Stat. Facts ¶ 12.e; *compare* Pl. Dep. Tr. Vol. 2 275-77 *with* ECF No. [82-2] (Pl. Decl.) ¶¶ 8-9, 11.

More specifically, the parties agree that it was standard practice for Continental and the airline industry in March 2012 for flight attendants to tidy the cabin approximately thirty minutes before arrival by collecting discarded service items, pillows, blankets, newspapers and magazines from the customers as well as by returning all service items and refuse to the galley for stowage or disposal. *Id*. ¶¶ 17-18. They dispute the *extent* to which flight attendants are required to (and presumably, therefore, typically do) keep the aisles clear of trash in flight. Plaintiff maintains that the pre-arrival "tidying" is not the only cleaning required by flight attendants throughout a flight. Pls. Stat. Facts ¶ 18.a; ECF No. [82-3] (Cordes Decl.) ¶¶ 10-11. Rather, they state that part of a flight attendant's responsibilities include ensuring that there is no trash in the aisles that may pose a safety hazard to passengers. Pls. Cntr.-Stat. Facts ¶ 4; Cordes Decl. ¶ 8; ECF No. [82-4] (Mackey Decl.) ¶ 10. By implication, flight attendants usually and are

6

expected to attend to their responsibilities regarding potentially hazardous trash in the aisles when they walk the aisles. Pls. Cntr.-Stat. Facts ¶¶ 6-7. According to Plaintiff, flight attendants are required to walk the aisles every fifteen minutes on nighttime flights, such as United 34. Plaintiffs do not dispute that flight attendants are not required to "remove every scrap of paper, plastic, crumb, or other refuse, no matter its size or visibility." Pls. Stat. Facts ¶ 18.c.

### III.  SUMMARY JUDGMENT STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including *inter alia*, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Howard v. Steris Corp.*, 550 F. App'x 748, 750 (11th Cir. 2013) ("The court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor."). However, material facts set forth in the movant's statement of facts and supported by record evidence are deemed admitted if not controverted by the opposing party. S.D. FLA. L. R. 56.1(b).

"[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v.*

*Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)). The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006). Even where an opposing party neglects to submit any alleged material facts in controversy, the court must still be satisfied that all the evidence on the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

### IV.    ANALYSIS

The parties dispute several issues of fact and their implications surrounding the incident of Plaintiff's injury while aboard Defendant's aircraft.  However, resolution of this case and the disposition of Defendant's Motion turns on a fact *not* subject to any genuine dispute. This fact is established even when granting Plaintiff the entirety of her factual statements and assertions and all reasonable inferences resulting from them. The central fact that is not in dispute is that the presence of a single piece of trash in the aisle of United 34 at the time of Plaintiff's injury was itself not unusual or unexpected.  As a result, by accepting that fact as true, there was no "accident" within the meaning of Article 17 of the Montreal Convention.  Summary judgment for Defendant is, therefore, appropriate.

**A.    Liability Under Article 17 of the Montreal Convention**

The Montreal Convention governs international travel and addresses and limits liability for airline carriers such as Defendant.  Montreal Convention, Arts. 1, 17.  Both the United States and the United Kingdom are signatories to the Convention.  *See* Int'l Civil Aviation Organization, Treaty Collection, Lists of Parties to Treaties (Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on 28 May 1999) (ECF No. [32-3]); U.S. Dep't of State: Treaties in Force: A List of Treaties and Other Int'l Agreements of the United States in Force on January 1, 2012 at pp. 334-35 (ECF No. [32-4]).

Article 17 of the Montreal Convention addresses accidents that injure passengers on board an aircraft or during the course of embarkation or disembarkation. It provides in relevant part that "[t]he carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention art. 17.  "An Article 17 claim thus has three elements: (1) an accident; (2)

9

that caused death or bodily injury; (3) that took place on the plane or in the course of any of the operations of embarking or disembarking." *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1172 (11th Cir. 2014).

"Not every incident or occurrence during a flight is an accident within the meaning of Article 17 even if the incident gives rise to an injury." *Air France v. Saks*, 470 U.S. 392, 403 (1985). Rather, the Supreme Court has defined an "accident" for purposes of the Montreal Convention as "an unexpected or unusual event or happening that is external to the passenger." *El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 165 (1999) (quoting *Saks*, 470 U.S. at 405); *see also Campbell*, 760 F.3d at 1172 (adopting definition of accident in *Saks* and *Tseng*); *Olympic Airways v. Husain*, 540 U.S. 644, 651 (2004) (defining accident" as "an unexpected or unusual event" and not 'the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft"). "This definition should be flexibly applied after assessment of all of the circumstances surrounding the passenger's injuries." *Saks*, 470 U.S. at 405.

To determine whether an event is "unexpected or unusual," a court must "look at a purely factual description of the events that allegedly caused the . . . injury suffered by the plaintiff." *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1521 (11th Cir. 1997). An event caused by carrier negligence may in fact be unexpected and therefore constitute an "accident" within the meaning of the Convention. *See*, *e.g.*, *Fishman v. Delta Air Lines, Inc.*, 132 F.3d 138, 141-43 (2d Cir. 1998) (injury resulting from routine procedure carried out unreasonably was unexpected and constituted an accident); *Adler v. WestJet Airlines, Ltd.*, --- F. Supp. 2d --- 2014 WL 3114070, at *6 (S.D. Fla. July 8, 2014) ("[A] flight crew's unexpected and unusual response to a passenger's medical condition is external to the passenger, and can be a Montreal Convention 'accident'"). However,"[t]he fact that a series of events is alleged to have been caused by 'crew

10

negligence' does not affect whether or not the event itself, as experienced by the passenger, was unexpected. *Campbell*, 760 F.3d at 1172. *See also Husain*, 540 U.S. at 657 (declining to adopt a negligence-based approach). A plaintiff in an action brought under Article 17 has the burden of establishing that an accident within the meaning of the Convention occurred. *See Ugaz v. Amer. Airlines, Inc.*, 576 F. Supp. 2d 1354, 1365 (S.D. Fla. 2008).

Despite the factual nature of the accident inquiry, courts both within this Circuit and outside have had occasion to examine Article 17 claims and resolve them on a motion for summary judgment. *See*, *e.g.*, *Ugaz*, 576 F. Supp. 2d at 1365-66 (granting summary judgment for defendant upon finding that an "inoperable escalator" was not "an 'unusual or unexpected event' sufficient to constitute an 'accident'"); *McDowell v. Cont'l Airlines, Inc.*, 54 F. Supp. 2d 1313, 1320 (S.D. Fla. 1999) (granting summary judgment for defendant upon finding that failure to divert flight and continuation of flight to its initial destination was not an "accident" under Article 17); *Rafailov v. El Al Israel Airlines, Ltd.*, 2008 WL 2047610, at *3 (S.D.N.Y. May 13, 2008 (granting summary judgment for defendant upon finding that "[t]he presence of a discarded blanket bag on the floor of an aircraft is [not] unexpected or unusual" and could not constitute an accident); *Sethy v. Malev-Hungarian Airlines, Inc.*, 2000 WL 1234660, at *4 (S.D.N.Y. 2000) (granting summary judgment for defendant upon finding that tripping over luggage left in the aisle during boarding did not qualify as an "accident" because there was nothing "unexpected or unusual" about a bag found in an aisle during the boarding process); *see also Craig v. Compagnie Nationale Air France*, 45 F.3d 435, at *3 (9th Cir. 1994) (affirming summary judgment for defendant because plaintiff "did not submit or point to any evidence . . . that finding shoes on the floor between two seats was unusual or unexpected"). *Cf. Waxman v. C.I.S. Mexicana De Aviacion, S.A. De C.V.*, 13 F. Supp. 2d 508 (S.D.N.Y. 1998) (denying summary

11

judgment, finding that "defendant's failure to remove a hypodermic needle may safely be viewed as an unusual, unexpected departure from ordinary procedures").

### B. The Subject Incident Is Not An "Accident" Within The Meaning Of The Montreal Convention

The undisputed facts here establish that the incident involving Plaintiff on United 34 was not an "accident" within the meaning of the Montreal Convention.

Defendant highlights the *Craig* and *Rafailov* decisions as involving facts particularly germane to Plaintiff's claim here. In *Craig*, the district court found a matter of law that the presence of shoes on the cabin floor of an aircraft was neither unusual nor unexpected. 45 F.3d 435, at *3. The Ninth Circuit affirmed on "slightly different" grounds, finding that the plaintiff had failed to submit any evidence that "shoes on the floor between two seats was unusual or unexpected." *Id*. In *Rafailov*, the court ruled that there was no Article 17 "accident" where a passenger slipped on a plastic bag (previously used to house a blanket provided by the carrier) located on the cabin floor beneath a seat during flight. 2008 WL 2047610 at *2-3. The court explained, "[a]fter four hours in flight, it would seem customary to encounter a certain amount of refuse on an airplane floor, including blanket bags discarded by passengers who had removed the bag's contents in order to use the blanket." *Id*., 2008 WL 2047610 at *3.

Plaintiffs stress two issues which they contend present factual controversies precluding summary judgment. First, Plaintiffs draw a sharp distinction between what may regularly be found between the rows of an aircraft from what is typically found in an aircraft's aisle mid-flight. For that reason, they argue, the *Craig* and *Rafailov* cases are distinguishable, and Defendant's evidence pertaining to trash on an aircraft's floor *after* passengers disembark is irrelevant. Second, Plaintiffs present evidence that in March 2012, both in the airline industry generally and at Continental and United, flight attendants were required and expected to remove

12

trash and debris that pose a safety hazard to passengers from the aisles of an aircraft in flight, such that trash would not frequently be found in an aircraft's aisle midflight.

The issues Plaintiffs raise are, ultimately, not material to the legal determination of whether the incident in question was unusual or unexpected. First, the Court will grant for purposes of this Motion the distinction Plaintiffs apply between the facts in *Craig* and *Rafailov* and those here – that there is a difference between items found between the rows of an aircraft and items discarded in an aircraft's aisles which affects whether the presence of those items represent an unusual or unexpected circumstance. The Court will further discount Defendant's evidence of trash in the aisles of planes post-passenger disembarkation. Regardless, the evidence Plaintiffs present as creating an issue of fact precluding summary judgment speaks only to a *general* issue of the prevalence of trash in an aircraft's aisle midflight. Plaintiffs' own facts establish that the precise circumstances which precipitated Plaintiff's injury here were not unexpected or unusual and, thus, cannot constitute an accident under Article 17 of the Convention.

The undisputed evidence, along with Plaintiff's submissions taken as true and drawing all inferences from them in their favor, illustrates the following: In March 2012, Defendant's aircraft were cleaned by a third party vendor prior to passenger embarkation on the international leg of their flight. Passengers, however, were permitted to board and were provided by the airline with a variety of items which could be turned into plastic trash. That trash may end up on the cabin floor, including in the aircraft's aisles. Trash in the aisles can pose a safety hazard to passengers. Flight attendants were responsible for ensuring that there was no trash in the aisles which could pose a safety hazard to passengers. Neither Continental nor United has any specific policy in place directed to trash removal from the aisles of an aircraft in flight. But, it was

standard practice for Continental and in the airline industry for flight attendants to tidy the cabin approximately thirty minutes before arrival – which included collecting trash from the aisles. Further, flight attendants were required to walk the aisles every fifteen minutes on nighttime flights, such as United 34. That said, flight attendants were not "janitors" and were not required to "remove every scrap of paper, plastic, crumb, or other refuse, no matter its size or visibility."

Plaintiff slipped an hour to an hour and a half prior to landing. That occurred prior to the standard thirty minute pre-landing tidying. Plaintiff did not notice anything in the aisle during her two-row walk to the lavatory. Plaintiff's trip to the lavatory took at most five to ten minutes. Therefore, even if flight attendants were required to walk the aisles every fifteen minutes, and even if the small scrap of translucent shrink wrap Plaintiff stepped on would have been identified as a potentially hazardous (or even an unsightly) item requiring removal, the flight attendants on United 34 on March 30-31, 2012 need not have encountered the trash in question while Plaintiff was in the lavatory. And even if they did so, Plaintiff herself admits that flight attendants are not required to "remove every scrap of paper, plastic, crumb, or other refuse, no matter its size or visibility." Plaintiff has presented no evidence that United 34 was otherwise unduly untidy. In fact, Plaintiffs go to lengths to dispute what they characterize as Defendant's presentation of a trash-strewn airline experience. Put another way, the facts presented here establish that it is not unusual or unexpected for there to be a single item of trash on the aisle of an aircraft while in flight – at the very least not during the purported fifteen minute intervals in between the usual nighttime flight attendant walks through the aisles. The presence of the trash in question was not unusual or unexpected. Thus, by definition, the incident that is the subject of Plaintiff's Complaint was not an "accident" within the meaning of Article 17 of the Montreal Convention.

### C. Plaintiff's Common Law Claims Are Preempted by the Montreal Convention

Both the Supreme Court and the Eleventh Circuit have made clear that the Montreal Convention "is the exclusive mechanism of recovery for personal injuries suffered on board an aircraft or in the course of embarking or disembarking from an airplane." *Marotte v. Amer. Airlines, Inc.*, 296 F.3d 1255 (11th Cir. 2002) (citing *Tseng*, 525 U.S. at 161). As a result, "[f]or all air transportation to which the Montreal Convention applies, if an action for damages falls within one of the treaty's damage provisions, then the treaty provides the sole cause of action under which a claimant may seek redress for his injuries." *Ugaz*, 576 F. Supp. 2d at 1360. *See also Jacob v. Korean Air Lines Co.*, 2014 WL 243150, at *8 (S.D. Fla. Jan. 13, 2014) ("[T]he Montreal Convention, where applicable, preempts state-law remedies."); *Siddiq v. Saudi Arabian Airlines Corp.*, 2013 WL 2152566, at *4 (M.D. Fla. Jan. 9, 2013) ("[T]he Montreal Convention provides the exclusive remedy to persons who suffer damages related to a covered international flight, thereby preempting any state law claims."); *Rafailov*, 2008 WL 2047610 at *2 (Montreal Convention "exclusively governs the rights and liabilities" of the parties and "preempt[s] state law" where the "incident giving rise to plaintiff's injury occurred on board an aircraft during the course of "international transportation" as defined by Article 1(2) of the Convention.").

Because Plaintiff's common law negligence claim in Court II of the Complaint is preempted by the Montreal Convention, it is dismissed with prejudice.[1] *See, e.g., Flamenbaum v. Orient Lines, Inc.*, 2004 WL 1773207, at *14 (S.D. Fla. July 20, 2004) (dismissing with

---

[1] Plaintiffs argue that Count II of their Complaint asserts a cause of action for negligence for damages above the Montreal Convention liability limits, and not a claim for common law negligence which would be preempted by the Convention. This reading of the Complaint stretches credulity, which explicitly asserts diversity jurisdiction – relevant only if it also asserts state law claims. Regardless, Count II would be dismissed for the same reasons described above. *See supra* § IV(B). Plaintiffs also claim that Defendant's argument for dismissal based on preemption should have been raised in a Rule 12 motion and is, therefore, untimely. However, federal preemption is construed as an affirmative defense. *See also Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) ("Federal pre-emption is ordinarily a federal defense to the plaintiff's suit."); *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012) ("Federal preemption is an affirmative defense that a defendant must plead and prove.").

prejudice state law negligence claims asserted against carriers as preempted by the Montreal Convention). Likewise, because it is premised on Plaintiff's carrier negligence claims, Robert Vanderwall's loss of consortium claim, Count III of the Complaint, is also preempted by the Montreal Convention and is dismissed with prejudice. *See*, *e.g.*, *Miller v. Cont'l Airlines*, 260 F. Supp. 2d 931, 940 (N.D. Cal. 2003) (dismissing derivative loss of consortium claim by non-passenger husband due to preemption by Montreal Convention).

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that Defendant United Airlines, Inc.'s Motion for Summary Judgment, ECF No. [32] is **GRANTED**.

The Clerk of Court is directed to **CLOSE** this case. Any pending motions are **DENIED as moot**. Any impending deadlines are **TERMINATED**.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 26th day of January, 2015.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record